THREE PARCELS OF EMBROIDERY (UNITED STATES v.). See Case No. 16,-512.

THREE PUNCHEONS OF RUM. See Case No. 10,548.

THREE RAILROAD CARS (UNITED STATES v.). See Case No. 16,513.

THREE THOUSAND BASKETS OF CHAMPAGNE (UNITED STATES v.). See Case No. 16,514

---

## Case No. 14,012.

### THREE THOUSAND ONE HUNDRED AND NINE CASES OF CHAMPAGNE.

[1 Ben 241.] [1]

District Court, S. D. New York. June, 1867.

CUSTOMS DUTIES — UNDERVALUATION — MARKET VALUE—PLACE OF MANUFACTURE—INTENT TO DEFRAUD THE REVENUE—EVIDENCE.

1. Where wines imported into this country, from Rheims, in France, were claimed to be forfeited to the government for alleged fraudulent undervaluation in the invoices: *held*, that the

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

"place" where the goods were procured or manufactured, as specified in the first section of the act of March 3, 1863 [12 Stat. 737], was not Rheims but France.

2. The "actual market value" spoken of in the statute, is the price which the owner or producer of the goods is willing to receive for them, if they are sold in the ordinary course of trade —the price which a purchaser must pay to get them.

3. If the claimants held these wines for sale at Rheims and in France, and named the prices at which they would sell them, and below which they would not sell them, then, in judgment of law, there was a market for the wines there, and the market price was the price so fixed by the claimants.

4. It would not do to say that there was no market value for this wine, because just the special wine in these bottles, so dosed and prepared, was not sold in Rheims; but that if wine, the same in all substantial particulars as to grade, quality, and body and marketable worth, appreciation and value, as this wine was, was sold in the market at Rheims, then there was a market value for this wine.

5. If the claimants, thinking that a certain letter to them contained a regular mercantile proposition, in answer fixed certain prices as the lowest cash prices, for export, for their wines in quantities, and the wines referred to were in substance the same as the wines in suit, the jury might infer that the claimants would have sold the same wines to any one at those prices, and that those prices were the market value.

6. If there was such market value for the wines, and the invoices were knowingly made at a lower rate, the wines should be forfeited.

[Cited in U. S v Doherty. 27 Fed. 736.]

7. If the invoices were made up with an intent, by false valuation, to evade or defraud the revenue, a similar result should follow.

8. Where probable cause is shown by the prosecution in such a case, which probable cause is to be judged of by the court, the burden is on the claimant to show his innocence.

9. Where invoices purporting to have been signed by one of the claimants, showing the consul's certificate attached that the subscriber was what he represented himself to be, had passed in due course of business through the hands of a deputy collector, he was competent to prove the signature upon certain invoices to be that of the claimants, though he had never seen them write.

10. The appraisement in court of the goods for the purposes of bonding was not evidence of market value.

11. Evidence of isolated transactions in similar wines in New York was not competent evidence on the question of market value.

12. Letters of other wine manufacturers than the claimants, as to their own wines, were admissible as evidence on the question of market value, provided the wines were substantially of the same grade and quality as those in suit.

This was one of several actions brought in behalf of the government to forfeit quantities of champagne wine, imported into this country by several manufacturers of it in France. The claimants in this case were [Alexandre] de St. Marceaux & Co., of Rheims. The libel of information alleged undervaluation in the invoices as ground of forfeiture, under the fourth section of the act of May 28, 1830 (4 Stat. 410), and the first section of the act of March 3, 1863 (12 Stat. 737). These wines had been imported into this country by the same men for years, during which time there had been several examinations at the custom house as to the correctness of the values stated in the invoices. The values stated in the invoices in question were the same as had been for several years passed at the custom house as correct for the same articles. The treasury department having sent agents over to France to inquire into the wine trade, received information which led to these seizures, and similar seizures were made in New Orleans, San Francisco, and Boston. The result of the San Francisco cases will be found reported in 3 Wall. [70 U. S.] 114. The testimony in the case was very voluminous, the case having occupied about three weeks in the trial. The judge has stated in his charge all of it that is material to the understanding of the case. In the course of the trial, the government called the deputy collector at New York, before whom the oaths were taken on the importations in question, and, having first proved by him the invoices in question, and that he recognized a similarity in the signature of the claimants on all of the invoices which had come before him, but that he had never seen any of them write, offered to prove by the witness that certain invoices, not of the goods in question, were signed by these claimants.

Mr. Evarts, in behalf of the government, cited the following authorities in favor of the admission of the evidence: Van Wyck v. McIntosh, 14 N. Y. 442; Doe v. Newton, 5 Adol. & E. 514; 2 Phil. Ev. 601, 615; Johnson v. Daverne, 19 Johns. 135; Jackson v. Murray, 7 Johns. 5; Titford v. Knott, 2 Johns. Cas. 214; 1 Greenl. Ev. §§ 577, 578; Brigham v. Peters, 1 Gray. 145; Amherst Bank v. Root, 2 Metc. (Mass.) 532. The court said that the case could not be distinguished from that in 2 Metcalf; that there was on the invoice a declaration in French, beginning: "I, the subscriber, declare that I am a member of the firm of de St. Marceaux & Co.," which went on to speak of the wines, and then there followed the certificate of the consul that the invoice was produced to him by the subscriber, and that he was the person he represented himself to be; and that, as this matter came before the witness in an official capacity in the custom house, the case came within the rule in 2 Metcalf, and the testimony was admissible. The claimants, on the trial, offered in evidence the appraisement filed in the case by appraisers appointed to appraise the goods for the purpose of bonding them, but, being objected to by the government, it was rejected by the court. The claimants called a witness who had purchased some of the wines of de St. Marceaux & Co. from their agent in New York at about the time in question (1864), and proposed to prove the transaction as evidence of market value, but the evidence, under the objection of the government, was excluded by the court.

The government offered in evidence certain letters from other manufacturers of wine tending to show the real value of their wines. The claimants objected to the evidence, and, in support of its admissibility, Mr. Evarts cited the Clicquot Case, 3 Wall. [70 U. S.] 114. The court held that the letters were competent under the ruling in that case, leaving it to the jury to consider whether the wines referred to in the letters were substantially of the same quality and grade as the wines under seizure.

Wm. M. Evarts, G. P. Lowrey, and W. G. Choate, for the government.

Webster & Craig, for claimants.

BLATCHFORD, District Judge (charging the jury). This case, as you have seen from the time occupied in the examination of witnesses and the discussion by counsel, and the principles involved in it, is one of very great importance to the parties to the suit and to the government. It has an important bearing also, as you have seen, in reference to other cases, the principles involved in this case applying to a large number of other cases which are upon the docket of this court. You have given a patient and attentive hearing to the evidence and to the arguments of counsel, and now you are to discharge the final and important duty of giving your verdict, if you are able to arrive at a verdict, under the charge of the court.

On the one hand, the government claims that this case is one of a systematic undervaluation in the invoices by the manufacturers of these wines—an intentional and willful undervaluation, resorted to, as is claimed by the government, because of the ad valorem system of duties which prevailed at the time in reference to champagne wines; and resorted to with full knowledge, as is claimed by the government, of what the law required, and of what values ought to be stated in the invoices. On the other hand, it is claimed by Mr. de St. Marceaux and his firm that there was no market for these wines at Rheims, and therefore no market value for them there; that the wines are not sold at Rheims by de St. Marceaux & Co. for export; and that, there being no market value for them at the place of their manufacture, their value, for the purpose of duty, must be arrived at by taking the cost of manufacture and adding to it a sum for the manufacturer's profit. This, they claim, has been fairly done by de St. Marceaux & Co. in this case.

These are the antagonistic positions assumed. You will perceive, therefore, that if, in the course of your inquiries, you shall arrive at the conclusion that there was a market value for the wines in these 3,109 cases in the principal markets of France, and that such market value was above the invoice value stated in these three invoices, you can dismiss all question as to the cost of

manufacture, or the cost of the wines, leaving then only one further question for consideration—whether such undervaluation by de St. Marceaux & Co. was made knowingly or not.

With this general view of the case, we approach the consideration of the particular questions involved in it. The libel of information, which is equivalent to a declaration in an ordinary action, is founded upon two statutes of the United States. One is the fourth section of the act of May 28, 1830, which provides, so far as it applies to the present case, that if an invoice be made up with an intent, by a false valuation, or false extension, or otherwise, to evade or defraud the revenue, the goods contained in the entry made on such invoice shall be forfeited to the United States. The other statute counted upon is the first section of the act of March 3, 1863, which provides, that if any owner of any merchandise shall knowingly make, or attempt to make, any entry thereof by means of any false invoice, or of any invoice which shall not contain a true statement of all the particulars required by that section, the merchandise shall be forfeited.

Now, under this last section, the first inquiry is, what are the particulars that are required to be stated in the invoice? Those particulars, so far as they apply to the present case, are the particulars required by the first section of the act of March 3, 1863, in reference to merchandise subject to ad valorem duties—that is, duties calculated at a percentage upon a written or fixed value set down by the merchant, and not a duty of so much per pound, or so much per gallon, by weight or measure. The requirements of the statute in regard to these particulars are as follows: If the merchandise is obtained in any other manner than by purchase, the invoice must state the actual market value thereof at the time and place when and where the same was procured or manufactured. On the other hand, if the merchandise is obtained by purchase, the invoice must contain a true and full statement of the time when and the place where the same was purchased, and the actual cost thereof, and of all charges thereon. These two provisions are very plain and simple, and need to be impressed firmly upon your memory. If the merchandise is obtained in any other manner than by purchase, the invoice must state the actual market value thereof at the time and place when and where the same was procured or manufactured. But if the merchandise was obtained by purchase, then the invoice must contain a true and full statement of the time when and the place where the same was purchased, and the actual cost thereof, and of all charges thereon. Now, in these provisions of law which I have just stated and repeated, placed side by side in the same section of the statute, you will see a policy which commends itself at once to the good

sense of every citizen. That policy is this: Every ad valorem system of revenue must be made, as far as possible, uniform in its operation, or it will be oppressive and unjust. Merchandise, as a matter of course, will be shipped to this country by the man who manufactures it, and like merchandise will be shipped here by the man who purchases it. If the manufacturer is allowed to invoice his merchandise at what it costs him to make it, and the purchaser is compelled to invoice his goods at what it costs him to buy them, inasmuch as the latter must pay for the goods not only what it costs the manufacturer to make them, but the profit of the manufacturer in addition, an unfair discrimination is made against the purchaser, enabling the manufacturer to undersell him in the market here, and in the end surely drive him out. That is a principle which is easy to be understood, and commends itself to the good sense of every one. Hence the rule referred to, which was adopted in previous laws to this of 1863, and which finds its expression in the language I have cited from the act of 1863. In the case of a purchaser of goods, the cost to him to buy the goods abroad is assumed, as a general rule, by the law, to indicate the actual market value of what he buys, it being presumed that he buys at the ordinary actual market value; and, to put the purchaser upon the same footing with the manufacturer, and to enable the government to collect substantially the same amount of duty, at the same ad valorem rate, on the same quantity of the same description of merchandise, whether shipped here for account of the purchaser, or for account of its manufacturer, the law requires the manufacturer to invoice his goods at their actual market value in the principal markets of the country where they were manufactured, no matter what they cost, no matter whether they cost more or less than such actual market value—in substance and effect, to invoice them at what the other man, the purchaser, would have to pay for them and invoice them at. That is the law, and it is perfectly plain and easy to be understood. The manufacturer cannot, under this law, take the cost to him to make the goods and add an assumed sum to that cost, and arbitrarily call that the market value which the law refers to. He may, to be sure, adopt such a course, but, if he does adopt it, he takes the risk of its being shown that the sum so fixed by him, no matter how he arrived at it, is less than the actual market value. In this case, the law presumes that de St. Marceaux and his house, the importers of these wines, knew the requirements of our law, and imposes upon them the obligation of knowing them, if they seek to avail themselves, under these requirements, of the privilege of entering merchandise which the law confers. But in this case you have something more than the presumption of law. In these invoices (and

they are all alike) there is a declaration attached to each, in the French language, made by Mr. de St. Marceaux, in which he states that the values set forth in the invoices are, as the French express it, the "veritable prix courant." The translation produced makes that to be "veritable" (actual) "courant" (market) "prix" (value)—actual market value—veritable or true current price, to be more literal. Every one can see that "current price" and "market value" are synonymous words. We have, in common speech, the word "price-current" in our language. What is a price-current but a statement or list of current prices, which are the market values of the merchandise stated in the list? We, therefore, have Mr. de St. Marceaux declaring that the prices stated in these invoices are the veritable current prices, or actual market values of the wines. The very language of the statute is adopted in these declarations and translated into French, Mr. de St. Marceaux's own language, and the meaning could not be misunderstood by him. At the side of each of these declarations (the declaration proper being in French) is an English memorandum in these words: "Declaration where goods, wares, and merchandise have not been purchased." Now, this circumstance must have struck your observation at once, in reference to these declarations, that Mr. de St. Marceaux, after making a declaration in French (his own language, as to the meaning of which he could not be mistaken), stating that the prices in the annexed invoice are the "veritable prix courant," the veritable current price, the actual market value of his wines at the time and place when and where the same were procured or manufactured (because the literal translation of the French is the exact language of our statute)—that M. de St. Marceaux, after making that declaration, now comes into court, and by his witnesses and counsel claims that these wines have no market value at Rheims, and that the invoices are made up on a different basis from that market value. What that different basis may be is of no consequence. The position assumed is that there is no market value at Rheims because there is no market there. Nevertheless, notwithstanding this, and although you may find there was a market value in France for these wines of de St. Marceaux, still, if the prices stated by de St. Marceaux, in his invoices, according to his declarations as to the market values, were, in point of fact, as high as the actual market values which you may find to be proved by the evidence, then, of course, the defence will have been made out.

There is one expression in the first section of the act of 1863 which requires an observation, and that is the word "place"—"the actual market value at the time and place when and where the same were procured or manufactured." The supreme court of the United States, in the case of Madame Clic-

quot's Champagne, in 3 Wall., have settled the law in regard to the meaning of the word "place," as used in that sentence, to be, that it has a meaning as extensive as the country of the manufacturer of these wines; that it does not mean Rheims, but France, the country where the wine are procured or manufactured; and that the standard to be applied under the law is the actual market value of the wines in the principal markets of France. In that case, the district court in California had limited the meaning of the word "place," in the act, to Rheims, the spot, the precise locality, where the wines were manufactured.

With these observations we are brought to consider the meaning of the words "actual market value," as used in the statute. And here also we have the authority of the supreme court to guide us, for, in the case of Madame Clicquot's Champagne, the district court in California, on the trial of the seizure case there of her wines, gave a very clear exposition of the meaning of the words "actual market value;" and the supreme court, in their opinion, say, that the charge of the learned judge in California embraced all the points in the case, and is satisfactory to the supreme court, and they concur in it. I have been furnished with a verbatim report of it. Now, what is the meaning of the words "actual market value?" The market value of goods is the price at which the owner of them, or the producer of them, holds them for sale—the price at which they are freely offered in the market—such prices as he is willing to receive if the goods are sold in the ordinary course of trade. This is common sense and reason. It is the popular meaning of the words, and it is their legal meaning; and we are brought around again, in this way, to the reason I before stated to you for the rule prescribed by the first section of the act of 1863, that this actual market value, to be stated by the manufacturer of the goods, is to be, and is intended to be, and is, the price which a purchaser must pay to get the goods. That is the actual market value, and nothing else is. In the present case, the government claims that the evidence shows that de St. Marceaux's house itself holds these wines for sale at Rheims and in France, has them on sale there, offers them freely for sale there, at prices fixed by the house of de St. Marceaux & Co., and, when applied to at Rheims, voluntarily names the prices for which it is willing to sell them in the ordinary course of trade, and below which it refuses to sell them in the ordinary course of trade. If this claim on the part of the government is true—if it be a fact that de St. Marceaux does so hold these wines for sale, and offers them for sale, and names the prices for which he is willing to sell them, and below which he will not sell them—if you shall find this to be true— then there is, in judgment of law, a market for the wines in France, and a market price

for them there, and a market value for them there, and such market price and market value is the price so fixed by de St. Marceaux, and so voluntarily named by de St. Marceaux.

Before going into the evidence on that subject as to whether there is or is not such a market value, I ought to make a remark upon one point. It will not do to say that there is no market value for these 3,109 cases at Rheims because the 3,109 cases were not themselves sold or to be sold at Rheims, but were to be sold in the United States. Nor will it do to say that there is no market value for these 3,109 cases, or for the wines in them, at Rheims, because just the special wine in the bottles in these cases, so dosed and prepared as this wine was, is not sold at Rheims. This would be trifling with the good sense of the law. You have heard the testimony on both sides, of the makers and dealers, of the brokers at Rheims, of Mr. Heidelberger, Mr. Weiland, Mr. Marshall, and others, and you will be able to judge— and it is for you exclusively to judge— whether wine, in all substantial particulars, as to grade, quality, and body and marketable worth, appreciation, and value, the same as the wine in these 3,109 cases, is or is not in the market and on sale at Rheims and in France. If it is, if there is a price which a purchaser must pay there for such wine, in order to get it in the quantities stated in these three invoices, then there is a market value for it there within the statute. The values stated in these three invoices, per case, are as follows all at Havre: For Carte Noir, quarts, 30 francs 50 centimes; for pints of the same, 33 francs 50 centimes; for Carte Blanche, quarts, 30 francs 50 centimes; for pints of the same, 33 francs 50 centimes; for Red Lac, pints, 34 francs 50 centimes, there being no quarts of Red Lac in the invoices; for the Royal St. Marceaux, quarts, 36 francs, and for pints of the same, 39 francs. That comprehends all the descriptions of wine in these invoices. These prices you will bear in mind, and I doubt not they are impressed on your memory sufficiently.

I will now refer to some of the evidence. In the first place, there is the evidence of Mr. Marshall. Who and what Mr. Marshall is, and the general credit you will give to his testimony, in view of his examination and cross-examination, I shall leave entirely to you, without any comment, merely stating, as I understand it, some of the salient facts, as bearing on the case, that are testified to by him. He procured in London certain prices current, and especially a price current from Groves & Co., the agents of de St. Marceaux there, and he had certain dealings, which I shall speak of hereafter, with Groves & Co., in reference to some wines of de St. Marceaux, and he names certain prices as stated to him by Groves & Co., and by the agents in London of other houses at Rheims, as the prices of these champagne wines in France

for export—the prices free on board at Havre. If you shall believe his evidence, then the prices which he states are to be taken into consideration by you as evidence of the market values in France of the wines he speaks of, whatever such wines may be, leaving only the question whether those wines are substantially the same as the wines in these 3,109 cases. Mr. Marshall says there are but three grades of champagne wine made as shipping wines, to export, by these manufacturers at Rheims, and on which they put their brand; that no matter how many different labels or brands or marks appear on them, there are but three grades of shipping wines, to export, on which they put their brand; that all the manufacturers there maintain substantially the same relations or proportions between the three grades which they make; and that they all make but three grades. He also says that a taster, and he himself, can tell by his taste, without seeing cork or label or brand, to which one of these three grades any particular wine that he may taste belongs; and that then, if that wine has a brand or label or mark upon it, so that he can become possessed of all the adventitious circumstances that give it a price or value in the market, he can tell, within four francs a case, the market value of that wine.

The bearing of this evidence, in connection with other evidence in the case given subsequently, is merely for the purpose of showing how many grades and qualities there are in fact of these wines, and especially of this de St. Marceaux wine, with a view of arriving at this question of actual market value; and, in that same connection, you will recollect the letter of de St. Marceaux & Co. to Leuchtenrath, in which they say to Leuchtenrath that they sell only three kinds; and they give in that letter the prices of three different grades or qualities, in that respect corresponding with the testimony of Marshall. In regard to these de St. Marceaux wines (for in what I have to say I shall confine myself solely to them) Marshall says, that the de St. Marceaux grade No. 3, or the lowest grade of the three, is worth 45 francs a case of a dozen quarts free on board at Havre; that that is the price, and that all these prices are the prices, for the last five or ten years in London, during which there has been no variation in the prices of the champagne of de St. Marceaux, or of any other brand, in London; that the lowest grade, No. 3, is 45 francs a case of a dozen quarts free on board at Havre, No. 2, 52 francs a case, and No. 1, 60 francs a case, including package and all expenses of putting on board the ship. On that same subject you will bear in mind the letter of de St. Marceaux and Co. to Leuchtenrath, in which they name three kinds and three prices: "Carte Blanche," 45 francs a case, or 3 francs 75 centimes a bottle—the same price that Marshall names for No. 3, or the lowest grade of the wine he speaks of. The second price stated by de St. Mar-

ceaux & Co. in their letter to Leuchtenrath, is for "Champagne Imperial," which is 48 francs. Marshall's second was 52 francs. The third price mentioned by de St. Marceaux & Co. in their letter to Leuchtenrath, is 60 francs, for "Royal." Marshall's price was 60 francs for No. 1, which I understand to be "Royal." These prices stated by de St. Marceaux & Co. to Leuchtenrath are prices for the wine taken in the cellar at Rheims, packing not included. Mr. Marshall produces five price-currents, which he obtained in London from the agents of the makers in Rheims, or parties who, he says, were the agents. You heard the testimony of Weiland in regard to the dealings of the house of Piper, Heidsieck & Co. with Newton, and of Heidelberger in regard to the dealings of de St. Marceaux & Co. with Groves & Co. I will, for the purpose of this trial, call these persons agents, as Mr. Marshall understood them to be in his dealings with them. He obtained one price-current from Groves & Co., and says that when he got that, in October, 1866 —(and this testimony must be taken in connection with his other testimony, that there has been no variation within the last five or ten years, in London, in the prices of any champagne)—that when he got this price-current from Groves & Co., in October, 1866, he bought from Groves & Co. some "Royal" at 48 shillings, or 60 francs a case, less 5 per cent. discount, which was net 57 francs; that he also bought from Groves & Co., at that time, some second quality of de St. Marceaux's wine at 36 shillings a case, or 45 francs, less 5 per cent. discount, which was net 42¾ francs; that Groves told him at the time that these were the lowest prices in bond, duty not paid, in London; that Groves would have sold it to any one in the trade at that price; and that he, Marshall, was in the trade, and Groves knew it, and sold the wine to him as to one in the trade, although in fact he bought the samples, two cases of one kind, I think, and perhaps about the same quantity of the other, as samples for the United States government. The 36-shilling or 45-franc wine, "second quality Ay" of de St. Marceaux wine, which Marshall bought, is, he says, the lowest wine that de St. Marceaux puts his brand on; and that, you will recollect, corresponded with the price stated by de St. Marceaux in his letter to Leuchtenrath for the lowest of the three grades named there—that is, 45 francs for "Carte Blanche." As to these prices of de St. Marceaux's wine in bond in London, without any English customs duty added, it is for you to judge whether these prices are or are not substantially the prices of the same wines free on board at Havre, that is, the lowest prices of them in France; and also whether these wines are substantially the same as the wines in the 3,109 cases in suit, and whether these prices have varied since the spring of 1864. In this connection Marshall says, that when he bought this wine from

Groves in the fall of 1866, he told Groves he was going to buy largely for shipping, and wanted a few cases for samples, and that Groves named his lowest prices for the wines in quantities, and gave him the samples at these prices. In regard to the other price-currents which Marshall obtained in London—namely, those from the agents of Piper, Heidsieck & Co., of Jules Mumm & Co., of Charles Heidsieck & Co., and of Moet & Chandon, and to the prices stated in those price-currents—I shall not refer to them particularly, leaving you to judge, from your recollection, whether they do or do not go to show, under the law as explained to you, that there was a market value for all these wines, and especially for this de St. Marceaux wine, in France in the spring of 1864. That is the only bearing of the evidence, and it is not to be considered in the case as applicable to any other points. There are also some price-currents of de St. Marceaux & Co. annexed to Heidelberger's deposition, two of Paris agents, and two of de St. Marceaux's house at Rheims, giving the price per bottle at Rheims, packing not included, and putting de St. Marceaux's Carte Blanche at 48 francs a case, and another kind at 60 francs a case. In regard to these price-currents, you will take into consideration the testimony of Heidelberger, who says they were mere puffing advertisements, and do not amount to anything. It is for you to judge. But, whatever these price-currents of the house of de St. Marceaux & Co. annexed to Heidelberger's deposition show as to the prices in fact —whether the prices are or are not puffing prices, or prices that are not reliable as prices for the wine in quantities—they undoubtedly show this, that the Carte Blanche wine named in them (and whether that wine is of the same grade and quality as the Carte Blanche in these 3,109 cases is for you to judge), and the other wines named in them are held by de St. Marceaux & Co. on sale at Rheims, deliverable there, and to be paid for there, and in the market there, at some market value or other fixed by de St. Marceaux & Co. themselves.

Then you have the testimony of the five brokers, and of the one ex-broker, who state that they know nothing in regard to sales of these prepared wines at Rheims; but that, without doubt, the prepared wines are sold at wholesale at Rheims in transactions which are private, not being made through brokers, and therefore not public, but made through correspondence, the sales of each house being known only to itself and to the persons who purchase from it.

Then you have the letter of de St. Marceaux & Co. to Leuchtenrath, brought out by the letter from Leuchtenrath to them. Leuchtenrath's letter is dated the 4th of November, 1863. In that letter, you will recollect, he asks the house of de St. Marceaux & Co. for the lowest price of their wines for cash, for export, and for considerable orders. That was the inquiry that brought out the answer that was made, and, in due course, three days afterward, that letter was replied to. On the 7th of November, 1863, they acknowledge the receipt of his letter and reply to it. They state, in substance, that de St. Marceaux & Co. make wines of only the very first quality, and sell only three kinds—"Carte Blanche" at 3 francs 75 centimes per bottle, "Champagne Imperial" at 4 francs per bottle, and "Royal St. Marceaux" at 5 francs per bottle, taken in the cellar, packing and all other costs at the charge of the buyer; half bottles, or pints, of the various kinds, 50 centimes more; the price to be payable in six months, or, if cash, then 3 per cent. discount; and that, if the orders should be considerable, and should be payable in cash, they would allow 10 per cent. more as commission to the purchaser. That is the letter, and all there is in it of any importance in the case.

Now, the law, as applicable to a letter of this kind, is this: If the house of de St. Marceaux & Co. thought that this was a regular mercantile proposition, and that Leuchtenrath was a general commission merchant, and, if the house of de St. Marceaux & Co. answered this letter voluntarily, and fixed certain prices as the lowest cash prices for export for the wines in considerable quantities, and if the wines, referred to by de St. Marceaux & Co. in the letter, were in substance the same as the wines in the 3,109 cases in suit, then you are at liberty to infer that de St. Marceaux & Co. would have sold the same wines to anybody at the prices named, and also to infer that there was a market value for the wines, thus made and fixed by de St. Marceaux's house itself, and that such market value is the price thus fixed. There are other letters introduced into this case from other houses, some to Leuchtenrath, and some to a man by the name of Hill, in London. The same remarks are applicable to the letters from these other houses, and to the prices named in them for the wines named, that I have applied to the wines and the prices in the price-currents obtained by Marshall in London for other wines than those of de St. Marceaux & Co.

As to this letter of de St. Marceaux & Co. to Leuchenrath, and as to the purchase by Marshall, as samples for the United States, of their wines from Groves & Co., no possible prejudice can attach to this mode of obtaining the information sought for, or to the officers of the United States for resorting to this mode. If Groves supposed he was selling to a regular purchaser, and named his lowest price for considerable quantities, and if de St. Marceaux supposed he was dealing with a regular customer in the ordinary way of trade, and named his lowest prices for cash, for export, for considerable quantities, it does not detract a particle from the value of the evidence, as evidence, that in fact Marshall was buying, and Leuchtenrath was writing, to obtain evidence to be used for the United States; because the test to be applied is the

state of mind of the seller to Marshall, and of the writer to Leuchenrath. As to the prices in the letter to Leuchtenrath, deducting discount and adding packing, to get at the prices at Rheims, the government claims that the prices stated by de St. Marceaux & Co. in their letter to Leuchtenrath as the prices at Rheims, make the following net prices which the purchaser would have to pay to get these wines for export, in considerable quantities, in the market in France, and that he could not get them for less; that is, 41 francs 45 centimes for "Carte Blanche," 44 francs 6 centimes for "Champagne Imperial," and 54 francs 54 centimes for "Royal St. Marceaux." If you should find that these prices, or any other prices which you may arrive at from the evidence, were the prices which any persons wishing to buy the wines would have had to pay for them in France, and that these prices were fixed by de St. Marceaux & Co., and that the wines are substantially the same as the wines in suit, and that the prices remained the same in the spring of 1864 that they were in November, 1863, when this letter was written to Leuchtenrath, then, in judgment of law, there was a market value at Rheims and in France for the wines in suit in the spring of 1864, and such market value was the prices so fixed by de St. Marceaux & Co. and nothing else. The government also refers to Heidelberger's testimony, which you will recollect, and upon which I shall not comment, except to refer you to it, in regard to invoices made by the house of de St. Marceaux & Co. at Rheims, to purchasers of wine there, at prices running from 3 francs 25 centimes and 3 francs 50 centimes per bottle to 5 francs per bottle. The government claims that Heidelberger testified that that wine was the same kind of wine as the "Carte Blanche" that he sends to the United States. The price of 3 francs 25 centimes a bottle would be 39 francs a dozen, 3 francs 50 centimes a bottle would be 42 francs a dozen, and 5 francs a bottle would be 60 francs a dozen, because it was not in cases, but was in bottles unpacked, and the cost of packing, which is testified to be 2 francs 16 centimes a dozen, is to be added, for the wine must be put in cases to be exported, and that expense is a portion of the dutiable value. The government claims that the testimony of Heidelberger shows the fixing by the house of de St. Marceaux & Co. itself of a market value for the wines in suit, and at a higher rate than the invoices.

Then you have the evidence on the part of the claimants in this case. You recollect the depositions of a large number of witnesses in France, the deposition of Heidelberger, the testimony of Weiland, and the depositions of the five brokers and the one ex-broker. Upon that subject I will refer to the charge of the court in the case in California, which was approved by the supreme court, and will read an extract from it: "On the part of the claimants, gentlemen, a large number of witnesses, most respectable, apparently, from their official positions" (witnesses like these brokers, about whom we have heard, as to their positions, qualifications, and character,) "have testified that there is no market value for this wine at Rheims. It is for you to say whether they are not totally mistaken, or, if they are not wholly mistaken, whether their mistake has not arisen from a misconception of what is the market value of wines. It is for you to say whether they mean anything more than that the manufacturers do not, at Rheims, deal in each other's wines." And I refer you to the language of one or two of the brokers in this case, where they state that there are no brokers or commission-merchants who deal at Rheims in these wines. "The statement made by them that there is no market value for champagne at Rheims must be taken by you with the explanations and qualifications with which it is given. It must be taken in connection with the rest of their evidence, showing in what sense they mean to say that there is no market value for these wines in the champagne district. It must be taken also in connection with the testimony offered by the United States to show that there is a market value for these wines; that is to say, that these wines are held at and can be obtained by anybody for certain determinate rates, below which they cannot be obtained."

Now, gentlemen, if, on all the testimony, you shall find that there was an actual market value in France for the wines in suit, then it was the duty of de St. Marceaux's house to put that value in the invoices. And the next question for inquiry is, have they done so? If you shall find that there was such actual market value, you will probably not have much difficulty in determining the question as to whether the invoice value is above or below such market value. If you shall find that it is below, then you must determine whether the undervaluation was intentional and done knowingly, or whether it was done unintentionally and ignorantly. If, in making out the invoices and asserting in the declarations annexed and required by the statute, that the prices stated in the invoices were the actual market value, the "veritable prix courant" of the wines in Rheims or in France, de St. Marceaux, who made the declarations in the invoices, knew better, then he did it knowingly; and if you believe that he knew that the invoices did not state as high a value as the actual market value, then the wines must be forfeited.

A good deal has been said in this case by counsel in regard to the manner and time and circumstances under which these wines were seized, and the persons by whom they were seized. That is something with which neither you nor the court have anything to do in this case. The government has adopted the seizure, and is in court upholding and maintaining it. It is of no consequence how it was made, or when it was made, or from what motive it was made, if the facts and the law

require the forfeiture of the goods. There is but one other rule of law to which I think it necessary to call your attention, and that is this: In a case like this, where probable cause is shown for the prosecution, and which probable cause is to be judged of by the court, the burden of proof is thrown on the claimant to dispel the suspicion and explain the circumstances which seem to render it probable that there has been a knowing undervaluation. The government having in this case, in the first instance, as decided by the court, established probable cause, it is for the claimants to show their innocence, and dispel and clear up the suspicion which the government in the beginning raised against them; and, under this rule, it is for you to say whether the claimants have made out their defence, and have shown that these wines were invoiced at their actual market value in the principal markets of France at the time they were manufactured. If they have not shown that, you will find for the United States; and if they have shown that, you will find for the claimants.

I have said everything that I deem it necessary to say in regard to the facts or the law of this case, and all propositions made on either side to the court to charge the jury, which are not embraced or covered affirmatively or negatively by the charge as given, will be considered as refused. You will give to this case, gentlemen, I doubt not, a patient and careful consideration, with an earnest desire to arrive at a just conclusion, and I commit it to you entirely satisfied that you will do so.

Mr. Webster.—If the court please, in the last proposition but one stated by the court there was an omission in regard to the statutory knowledge or intent. I think the general direction of this part of your honor's charge on that point was, that if the jury found that the goods were undervalued, they were to find for the government. There was no condition annexed in regard to guilty knowledge or intent.

Mr. Evarts.—When your honor was passing upon the question of probable cause and the burden of proof, you did not repeat, my learned friend thinks, the condition of knowledge in which the undervaluation was made.

THE COURT.—Of course, gentlemen, you will understand that even if you find that these goods were undervalued—that is, if they were valued in the invoices at less than the actual market value—you still must find, in order to forfeit the goods, that this was done knowingly by the house of de St. Marceaux & Co.

Mr. Webster.—There are two counts in the information, one under the fourth section of the act of 1830, and one under the first section of the act of 1863. The fourth section of the act of 1830 refers to "intent" to evade the duty.

THE COURT.—Of course, from what I have said, you will understand that the word "knowingly" occurs in the statute of 1863, and applies to that statute, and that under the count founded upon that statute you must find that the undervaluation was made knowingly by de St. Marceaux & Co. There is a count under the fourth section of the act of 1830. Under that section you must find, in order to find against the claimants and in favor of the government, that the invoice was made up with an intent, by false valuation or extension or otherwise, to evade or defraud the revenue; and under that section, unless you find that, the goods cannot be forfeited. But you can find for the government under either statute, or under either count of the libel. You may find under the law of 1830, or under the law of 1863. If you find against the claimants under either one, the goods are to be forfeited.

The jury failed to agree upon a verdict, and the case was compromised without a second trial.

THREE TONS OF COAL (UNITED STATES v.). See Case No. 16,515.

THRELKELD (CLARKE v.). See Case No. 2,865.

THRELKELD (WILLIAMS v.). See Case No. 17,741.

THROCKMORTON (UNITED STATES v.). See Case No. 16,516.

THROGMORTON (STOCKTON v.). See Case No. 13,463.